## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**MELVIN TIMOTHY MOSLEY,**

       **Plaintiff,**

**v.**                             **Case No.: 2:17-cv-04197**

**NANCY A. BERRYHILL,**
**Acting Commissioner of**
**Social Security,**

       **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 10, 13).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the presiding District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF

1

No. 10); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); and **DISMISS** this action from the docket of the Court.

## I.    <u>Procedural History</u>

On January 17, 2014, Plaintiff Melvin T. Mosley ("Claimant") protectively filed an application for DIB, alleging a disability onset date of September 13, 2013 due to back pain, high blood pressure, hearing loss, obesity, and hand numbness. (Tr. at 151, 171). The Social Security Administration ("SSA") denied Claimant's application initially on March 20, 2014 and upon reconsideration on May 23, 2014. (Tr. at 85, 95). Claimant subsequently filed a request for an administrative hearing. (Tr. at 98). The hearing was held on March 18, 2016 before the Honorable Toby J. Buel, Sr., Administrative Law Judge ("ALJ"). (Tr. at 25-53). By written decision dated May 13, 2016, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 10-20). The ALJ's decision became the final decision of the Commissioner on August 16, 2017 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6)

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 13). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 49 years old on his alleged disability onset date and 53 years old on his date last insured (Tr. at 10, 54). He communicates in English and has completed high school. (Tr. at 170, 172). Claimant worked as a janitor for 10 years prior to beginning work

in the coal industry, where he was employed for 23 years until September 2013. (Tr. at 35). A vocational expert testified that the Claimant's past work as a coal miner was at the medium exertional level. (Tr. at 50-51, 173).

### III.   <u>Summary of the ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the

measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or

"mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2017. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since September 13, 2013, his alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the cervical and lumbar spine with disc osteophytes, hearing loss, and obesity." (Tr. at 12-13, Finding No. 3). The ALJ considered and found non-severe Claimant's alleged ailments of hypertension, hyperlipidemia, generalized anxiety disorder, and adjustment disorder with depressed mood. (Tr. at 13-15).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments

contained in the Listing. (Tr. at 15, Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). He can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs. The Claimant can occasionally balance, stoop, kneel, crouch, and crawl. He can have no exposure to heights, moving machinery, or hazards. He can occasionally tolerate extremes of temperature and vibration. The Claimant can tolerate only a moderate noise level, defined as no louder than office level. He would be afflicted with chronic pain noticeable to himself at all times but can maintain attention and concentration in two-hour increments with normal morning break, lunch break, and afternoon break.

(Tr. at 15-18, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 18, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 18-19, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1964 and was defined as a younger individual age 18-49 on the alleged disability onset date, and that he subsequently changed in age category to closely approaching advanced age; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 18, Finding Nos. 7-9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs at the light exertional level that existed in significant numbers in the national economy; including cleaner, table worker, and battery tester. (Tr. at 19, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 19-20, Finding No. 11).

**IV.    <u>Claimant's Challenges to the Commissioner's Decision</u>**

Claimant raises essentially two challenges to the Commissioner's decision. First, he contends that the ALJ failed to consider in the RFC assessment the limitations imposed on Claimant by his irritability and social difficulties in dealing with those outside his immediate family. (ECF No. 10 at 7). On this point, Claimant argues that while the ALJ found mild limitations in both social functioning and concentration, the RFC finding only took into consideration concentration and memory deficits. (*Id.* at 8). This, Claimant asserts, represents a clear failure of the ALJ in his "duty to resolve conflicts in evidence," as "even non-severe impairments should be considered in the RFC." (*Id.*). Claimant also suggests that the ALJ placed too much weight on the opinion of Dr. Fernandez, a treating psychologist, in fashioning the limitation related to Claimant's concentration deficits. (*Id.* at 10).

In his second challenge, Claimant states that the ALJ improperly evaluated his pain symptoms; specifically, the ALJ did not analyze the symptoms under Social Security Ruling ("SSR") 16-3p and failed to consider a psychological cause of Claimant's pain symptoms. (*Id.* at 11-12). According to Claimant, SSR 16-3p provides guidance on how the ALJ should assess symptoms through an evaluation of the medical source information; including (1) the longitudinal record of treatment and its success or failure, as well as side any effects of medication, and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. (ECF No. 10 at 11-12); *see also* SSR 16-3p, 2017 WL 5180304, at *2. Claimant argues that the ALJ failed to analyze the medical source information as required by SSR 16-3p, both by failing to discuss the conclusions to be drawn by the longitudinal record of treatment, and by failing

to consider the implications of a statement by Claimant's treating psychologist suggesting that Claimant consider a psychogenic component to his pain. (ECF No. 10 at 12).

In response to these challenges, the Commissioner contends that Claimant undermines his own argument related to the impact of his mental health on his capacity to function. The Commissioner points to Claimant's testimony, statements, and function reports in which Claimant repeatedly denied a psychological cause of his alleged inability to work. (ECF No. 13 at 13). The Commissioner further notes that the Claimant's treating physician likewise found no psychological impairment that prevented Claimant from working. (*Id.*). With respect to the ALJ's symptom analysis, the Commissioner asserts that Claimant is unable to demonstrate any concrete errors by the ALJ; instead, Claimant's true goal is to have the Court re-weigh the evidence and come to a different conclusion than the ALJ, which is not a task within the Court's standard of review. (*Id.* at 8).

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The information most relevant to the Claimant's challenge is summarized as follows:

### A. Treatment Records

On January 14, 2013 Claimant was seen by nurse practitioner, Darlene Fields, at the Healthy Habits Wellness Center. He complained of nausea, fatigue, vertigo, fever and low back pain, generalized anxiety disorder, ear infections, and acute bronchitis. (Tr. at 276). Claimant was seen again on April 11, 2013 for continuing back pain, fatigue, decreased hearing, earache, vertigo, sore throat, muscle soreness as well as anxiety, nervousness and panic attacks. (Tr. at 273-274). On June 6, 2013 he returned and was

assessed with degeneration of cervical intervertebral disk, muscle spasm, and osteoarthritis. (Tr. at 272).

An August 22, 2013 analysis of a magnetic resonance imaging (MRI) study of the cervical spine revealed instances of cervical spondylosis. (Tr. at 296). A contemporaneous MRI scan of the lumbar spine revealed multilevel degenerative changes. (Tr. at 294). Claimant sustained a work-related injury on September 13, 2013, precipitating the alleged onset date of his disability. (Tr. at 304). A subsequent lumbar MRI scan on February 13, 2014 showed no significant change from the August 2013 exam. (Tr. at 317). A second cervical MRI test on October 22, 2014 revealed some mild canal narrowing and some mild to moderate foraminal stenosis as in the prior August exam. (Tr. at 407).

In late 2013, Claimant began seeing Dr. Kenneth Adkins, a family physician, for back pain. (Tr. at 304). In January 2014, Claimant first reported feeling "malaise" to Dr. Adkins. (Tr. at 310). He again reported malaise on two subsequent visits. (Tr. at 310-315). On February 25 and March 25, 2014 Claimant denied feeling depressed. (Tr. at 322, 328). Nonetheless, Dr. Adkins diagnosed Claimant with depressive disorder and prescribed Celexa on March 25, 2014. (Tr. at 329).

On June 19, 2014, Claimant was evaluated by Juan Egas, M.D, a pain management doctor. (Tr. at 353). Dr. Egas reported that Claimant appeared to be a "very pleasant" man who was healthy and well groomed, showed no signs of depression or anxiety, appeared "alert and oriented," and showed normal mood and affect. (Tr. at 353).

Claimant returned to Dr. Adkins on August 26, 2014 and continued seeing Dr. Adkins through August 2015, reporting depression on 8 visits. (Tr. at 365, 366, 370, 374, 379, 391, 399, 403). Claimant frequently stated during these visits that his depression did

not interfere with his daily life; that he was able to maintain relationships; and that he could sleep well and "maintain functionality." (Tr. at 370, 374, 378, 391, 403). On August 26, 2014, Dr. Adkins documented that, despite having depression and anxiety, Claimant was able to maintain relationships and displayed no social isolation or suicidal ideation. (Tr. at 364). On October 7, 2014 Dr. Adkins again noted that Claimant's depression did not prevent him from maintaining relationships and did not interfere with his activities of daily living. (Tr. at 370). Claimant did not display any symptoms of isolation or apathy and was able to maintain functionality. (*Id.*). Dr. Adkins made the same evaluations when he treated Claimant on October 28, 2014, December 16, 2014, February 10, 2015, May 5, 2015, and August 12, 2015. (Tr. at 374, 378, 391, 399, 403). There is no indication that Claimant reported depression during his two visits in January 2015. (Tr. at 384-390).

On May 26, 2015 Claimant began treatment with Dr. Christopher Kim at the Center for Pain Relief. (Tr. at 415). Dr. Kim recommended a treatment plan of lumbar interlaminar epidural steroid injection and facet joint injections to alleviate Claimant's pain symptoms. (Tr. at 452). Claimant subsequently undertook treatment in accord with this plan. (Tr. at 444, 449). On Claimant's final visit in November 2015, Dr. Kim noted that Claimant reported no relief from the lumbar epidurals or facet joint injections. (Tr. at 474). Dr. Kim documented that the "patient has failed all conservative treatment options." (Tr. at 475). Dr. Kim planned to refer Claimant to a rheumatologist "to see if there is some other cause for his pain." (Tr. at 474).

In July 2015, Claimant began treatment with Martha Fernandez, Psy.D, at Marshall Psychiatry and Behavioral Medicine. (Tr. at 495). He described himself as "staying depressed" since beginning unemployment in 2013 and complained of having

10

crying spells and aggravation over his inability to financially support his family. (*Id.*). He admitted to occasional suicidal ideations, but stated that he could never act on the impulse as he must stay strong for his family. (*Id.*). Claimant indicated that he has always been "opinionated" but had gotten more easily upset since becoming unable to work. (*Id.*).

Claimant described his anxiety symptoms as excessive worrying, specifically about his children, which occasionally escalated to the point where he felt smothered. (*Id.*). These episodes occurred once or twice per week to once per month. (Tr. at 495). Claimant recounted having been present during the 1972 flood of Buffalo Creek and witnessing many people die. (*Id.*). He continued to have occasional nightmares about the flood. (Tr. at 496). Claimant also reported a 1998 incident in which he was accused of sexual assault, which had led to increased stress. (*Id.*). However, he declined to discuss the incident further, saying only that he "was done wrong." (*Id.*).  Claimant denied a history of heavy alcohol intake, commenting that he rarely drank, perhaps once a month if he had company. (*Id.*).

On mental status examination Claimant was in mild distress, adequately groomed, and exhibiting appropriate behavior. (Tr. at 497). He was cooperative, but guarded and showed nervousness and self-blame. (*Id.*). Claimant's thought process was logical and goal directed with no "loosening of associations." (*Id.*). Dr. Fernandez felt Claimant's judgment was good and his memory was "intact for interview." (*Id.*). She evaluated Claimant's concentration as intact for age and education. (*Id.*). Dr. Fernandez found Claimant to be "fully oriented to person, place, time and circumstance, and his "fund of knowledge" was adequate and appropriate. (*Id.*).

Dr. Fernandez diagnosed Claimant with generalized anxiety disorder and

adjustment disorder with depressed mood. (Tr. at 497). She stated that his panic symptoms "appear to be cued by perseverative and ruminative worry." (*Id.*). She believed Claimant's depression was longstanding, but felt that his awareness of the symptoms stemmed from his change in employment status. (*Id.*). Dr. Fernandez felt that Claimant's description of the 1972 flood was indicative of "trauma sequelae," but was insufficient to fulfill criteria for post-traumatic stress disorder. (*Id.*). Dr. Fernandez assessed Claimant's overall risk for suicide as a "minimal concern" due to protective factors such as social support, and future orientation. (Tr. at 497). Her treatment plan was to increase "emotional regulation, distress tolerance, and interpersonal effectiveness." (*Id.*).

Claimant met with Dr. Fernandez again on November 19, 2015. (Tr. at 501). Claimant exhibited mild distress, but displayed appropriate behavior and appeared cooperative and pleasant. (*Id.*). His mood was anhedonic and sad. (*Id.*). Claimant's memory and concentration was intact for age and education; his thought process was logical and goal oriented, and his fund of knowledge was adequate. (Tr. at 502). Dr. Fernandez's diagnoses remained the same. (*Id.*). She noted that Claimant "shows good assimilation of such concepts as radical acceptance, and he appears fairly receptive to information regarding the psychogenic aspects of pain experiences." (*Id.*). She evaluated no change in Claimant's risk of suicide. (*Id.*).

Claimant met with Dr. Fernandez a final time on December 21, 2015. (Tr. at 499). He admitted to feeling depressed due to the proximity of Christmas and his inability to provide for his family. (Tr. at 499). He was having difficulties practicing "wise mind" as he often broke down into "intropunitive shaming thoughts." (*Id.*). Dr. Fernandez made the same findings regarding Claimant's mood, personality, memory and concentration.

(Tr. at 499-501). His risk assessment did not change and the plan was to continue treatment in "core mindfulness and distress tolerance skills." (*Id.*).

### B. Opinion Evidence

On May 12, 2014, Gerald Hawkins, the state agency adjudicator for Claimant's disability reconsideration claim, sent Dr. Adkins a questionnaire about Claimant's mental health. (Tr. 316). In his response, Dr. Adkins stated that he had diagnosed Claimant with depressive disorder and prescribed him an antidepressant, Celexa. (*Id.*). Dr Adkins opined that Claimant's depression did not result in any functional limitations and did not interfere with Claimant's ability to work. (*Id.*). Finally, Dr. Adkins confirmed that he had not referred Claimant to a mental health specialist for treatment. (*Id.*).

### C. Claimant's Statements

#### 1. Hearing Testimony

Claimant testified at the March 18, 2016 administrative hearing that he was 51 years old, 5 feet and 5 inches tall, and weighed 247 pounds. (Tr. at 32). He completed high school and lived with his wife and daughter. (Tr. at 34). As to his impairments, Claimant testified that he had difficulty walking or sitting for extended periods. (Tr. at 37). He usually tried to walk 5-6 times a day for about an hour or so. (*Id.*). He stated that he was able to fix simple meals, occasionally went grocery shopping, and drove short distances. (Tr. at 37-39).

When asked by the ALJ if there were any mental, emotional or neuropsychological problems that kept him from working, the Claimant responded, "I get stressed some, here and there." (Tr. at 41). Later, Claimant testified that he and his wife did not go out and socialize anymore. (Tr. at 47). Claimant explained that they no longer had money to go

out and many activities were too painful for him. (*Id.*). Claimant further testified that he had gotten more "grouchy," tense and agitated since the accident. (Tr. at 48). When asked directly if he felt his psychological problems, alone, prevented him from working, Claimant responded in the negative stating: "I don't think that as far as psychological keeps me from working. I enjoyed working when I worked. I mean I felt like it was worth something when I'm working." (*Id.*). Claimant admitted that he started seeing a psychiatrist, because "my wife kept asking me to go, and I went." (*Id.*).

## 2. Claimant's Function Reports

In an Adult Function Report, Claimant indicated that he spent time with others, stating that his wife and daughter lived with him and he saw other family members on rare occasions. (Tr. at 188). Claimant denied having trouble getting along with others. (Tr. at 189). He added, however, that he did not see many people because his activities were very limited. (*Id.*). Claimant explained that "pain and lack of sleep" affected his ability to concentrate, making it difficult to remember things and be around people, so he tended to avoid others whenever possible. Claimant denied having trouble with authority figures. (Tr. at 190). Finally, Claimant stated that he "tr[ies] to avoid stress, but can get pretty irate when pressed." (*Id.*).

In a subsequent Adult Function Report filled out for him by his wife, Claimant again denied having problems getting along with others, but reiterated that he rarely went out and did things with people. (Tr. at 211). He still had no trouble with authority figures. (Tr. at 212). Claimant continued to suffer from anxiety and depression. (*Id.*).

## VI.    <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is

based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  **Discussion**

### A. *Social Functioning Analysis*

Claimant contends that the ALJ failed in his RFC analysis as he did not include limitations for Claimant's social functioning difficulties. (ECF No. 10 at 8.) He argues that this is a clear failure on the part of the ALJ as even non-severe limitations should be considered in the RFC finding. (*Id.*). Claimant additionally argues that the ALJ failed to appropriately resolve conflicting evidence in the record. (*Id.*).  The undersigned finds Claimant's challenges to be unpersuasive.

The ALJ first discussed Claimant's mental impairments at step two of the sequential process. (Tr. at 13-14).[1] He did so under the four broad functional areas, known as the "paragraph B" criteria, set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing. (Tr. at 14). Under the first functional area—activities of daily living—the ALJ found no limitations. (*Id.*). He based this finding on Claimant's Adult Function Reports, which did not reflect any difficulties in completing personal care tasks due to psychological limitations. In addition, Claimant did not complain of any such difficulties in the statements he made to his family physician, Dr. Adkins. (*Id.*).

The ALJ found mild limitations in the social functioning category. (*Id.*). He acknowledged Claimant's testimony that he often felt grouchy and irritated. (*Id.*).

---

[1] Claimant primarily argues that the ALJ erred by not creating appropriate RFC limitations. However, to the extent that Claimant alleges the ALJ erred by not finding his mental health issues to be "severe" at step two, this alleged error was harmless as the ALJ considered the functional limitations imposed by Claimant's mental health impairments at later steps of the sequence. *See Miller v. Colvin*, No. 2:13-CV-31251, 2015 WL 917772, at *11 (S.D.W. Va. Mar. 3, 2015) ("Courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not reversible error as long as the process continues and any functional effects of the impairment are appropriately considered during the later steps." (collecting cases)).

However, the ALJ contrasted this evidence with the Adult Function Reports prepared by Claimant and his wife in which they both indicated that Claimant spent time with others on a daily basis and had no problem getting along with friends, family or neighbors. (Tr. at 14). The ALJ also noted that Claimant denied that his depression interfered with his ability to maintain relationships in statements he made to Dr. Adkins. (*Id.*). Finally, the ALJ referenced Claimant's representations to Dr. Fernandez that his relationships with his children and wife were good even during times of separation. (*Id.*).

In the third functional area—concentration, persistence or pace—the ALJ found Claimant to be mildly limited. The ALJ considered Claimant's testimony that he could not pay attention for long periods of time and had difficulty finishing what he started. (*Id.*). However, the ALJ pointed out that Dr. Fernandez's objective clinical records consistently demonstrated Claimant's concentration and memory to be intact. (*Id.*). Lastly, the ALJ found no evidence that Claimant had experienced episodes of decompensation. (*Id.*). Taken as a whole, these findings showed that Claimant's mental impairments only minimally affected Claimant's ability to function and were, therefore, non-severe. (Tr. at 14).

The ALJ further explained his findings, citing to Dr. Adkins's report that Claimant's mental disorders did not create any functional limitations that interfered with his ability to work. (*Id.*). The ALJ assigned "great weight" to Dr. Adkins's opinion as it was supported by the evidence in the record. (*Id.*). In accord with Dr. Adkins's opinion, no medical record reflected functional limitations related to Claimant's mental impairments. (*Id.*). The ALJ emphasized that Dr. Adkins's opinion was also consistent with Claimant's testimony at the hearing in which he conceded that his psychological issues did not

prevent him from working and that he only sought treatment from a psychologist to placate his wife. (Tr. at 14). The ALJ indicated that despite the dearth of evidence corroborating functional limitations, given Claimant's testimony regarding irritability and lack of concentration, the ALJ would assign mild limitations in those areas. (*Id.*).

In the residual functional determination, the ALJ included, among a host of physical limitations, a limitation recognizing that Claimant's mental impairments reduced his ability to maintain attention and concentration to two-hour increments with normal morning, lunch, and afternoon breaks. (Tr. at 15, Finding No. 5). Claimant argues that this limitation is insufficient as it "included no limitations relating to the claimant's psychological complaints about his irritability [and] trouble coping with people outside of his immediate family." (ECF No. 10 at 7). Claimant takes issue with the ALJ's assessment of evidence in reaching his RFC conclusions. He contends first that the ALJ assigned too much weight to Dr. Adkins's opinion regarding his ability to work despite the mental disorders. (ECF No. 10 at 9). Claimant asserts that as Dr. Adkins was only a primary care physician, with "no specific expertise in anxiety or depression," his opinion on Claimant's functional limitations should be given little weight. (*Id.*). Claimant also disagrees with the ALJ's use of the Adult Function Reports, arguing that while he did indicate he spent time with others, this was only in reference to his wife and daughters and the occasional visiting family member; it does not speak to his ability to get along with strangers in the work environment. (ECF No. 10 at 9; Tr. at 188). In the same vein, Claimant argues that the ALJ misconstrued his answer of "No" to the question asking if he had any trouble getting along with others as underneath it he explains that he does not see people anymore due to his illnesses. (ECF No. 10 at 9; Tr. at 189). Claimant points out

other responses in his reports that indicate stress and antisocial behavior. (ECF No. 10 at 9-10). Finally, Claimant disagrees with the conclusions the ALJ drew from Dr. Fernandez's clinical records. (ECF no. 10 at 10). Claimant argues that, as above, his ability to maintain relationships with immediate family members does not address the issue of social functioning with strangers. (*Id.*).

To begin, Claimant is incorrect in stating that the absence of an accommodation in the RFC finding for his social limitations constitutes a clear error by the ALJ. Indeed, not even a finding of severe impairment necessitates the inclusion of a corresponding limitation in the RFC finding. *See, e.g., Miller v. Colvin*, No. 2:13-CV-31251, 2015 WL 917772, at *16 (S.D.W. Va. Mar. 3, 2015) (holding that the claimant's "challenge must also be rejected because its premise is fundamentally flawed. Claimant presumes that if the ALJ found Claimant's mental impairments to be severe impairments at step two of the process, he automatically was bound to include functional limitations in the RFC finding to account for those impairments."); *See also Burkstrand v. Astrue*, 346 F. App'x 177, 180 (9th Cir. 2009) ("To the extent [Claimant] suggests that a finding of severe impairment at Step 2 necessarily requires limitations on a claimant's ability to perform basic work activities, this argument has no merit."); *Perez v. Colvin*, No. 3:13CV868, 2014 WL 4852836, at *19 (D. Conn. Apr. 17, 2014) (report and recommendation noting that "ALJ is not required to assess additional limitations for each impairment"), report and recommendation adopted by 2014 WL 4852848 (D. Conn. Sept. 29, 2014); *Walker v. Colvin*, No. C13–3021–MWB, 2014 WL 1348016, at *7 (N.D. Iowa Apr. 3, 2014) ("A finding of a severe impairment at Step Two does not require the ALJ to provide related functional limitations at Step Four."); *Burns v. Astrue*, No. 2:11–cv–151–GZS, 2012 WL

19

313705, at *4 (D. Me. Jan. 30, 2012) (report and recommendation recognizing that "a finding of a severe impairment need not always result in limitations in an RFC"); *Hughes v. Astrue*, No. 1:09CV459, 2011 WL 4459097, at *10 (W.D.N.C. Sept. 26, 2011) (holding that a finding of impairment at step two is not "proof that the same limitations have the greater significant and specific nature required to gain their inclusion in an RFC assessment at step four."). Moreover, when, as here, an ALJ determines that mental impairments create only a mild limitation, the ALJ is perfectly justified in concluding that no related functional limitation belongs in the RFC finding. *See e.g.*, *Miller v. Colvin*, No. 2:13-CV-31251, 2015 WL 917772, at *21 (S.D.W. Va. Mar. 3, 2015) (upholding the ALJ's decision to not include a mental limitation in the RFC for a finding of mild mental impairment where there was evidence the mental impairment was non-severe).

Furthermore, Claimant's contention that the ALJ failed to appropriately resolve conflicting evidence in the case is without merit. Claimant does not identify the purported conflicting evidence in his argument, but instead he takes issue with the ALJ's analysis of the evidence and the weight given to the opinions of Dr. Fernandez and Dr. Adkins. The ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining

20

whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability". *Id.* §§ 404.1527(c)(2), 416.927(c)(2).

A treating source is defined as the claimant's own acceptable medical source who provides, or has provided, the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1527(a)(2). An ongoing treatment relationship is generally found when the medical evidence establishes that the claimant sees, or has seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical conditions in question. *Id.* An acceptable medical source who has treated or evaluated the claimant only a few times or only after long intervals may be considered a treating source if the nature and frequency of the treatment or evaluation is typical for the conditions in question. *Id.*

Here, when considering Claimant's mental impairments, the ALJ gave "great weight" to Dr. Adkins's opinion that his mental impairments did not interfere with his ability to work as it was "supported by the evidence." (Tr. at 14). Claimant argues that this opinion should have been given little weight as Dr. Adkins was not a specialist in mental health. (ECF No. 10 at 9). However, Claimant points to no other conflicting opinion from a more qualified source. The only other medical source to assess Claimant's mental fitness was Dr. Fernandez, starting in 2015, and Claimant argues that her conclusions were also

given too much weight. (ECF No. 10 at 10). Dr. Adkins indicated that he did not think Claimant's disorders warranted referral to a mental health specialist in his 2014 opinion. (Tr. at 316). He continued to treat Claimant through 2015, and it does not appear he changed his mind on this issue as Claimant indicated he began therapy at the request of his wife, not his treating physician. (Tr. at 48). Dr. Adkins saw Claimant over 15 times through the course of almost two years. (Tr. at 304-313, 321-330, 363-405). As Dr. Adkins examined and treated Claimant's depression and anxiety, and as Claimant points to no conflicting medical opinion on the issue, indeed his own testimony supports the opinion, his argument that the ALJ erred in assigning it great weight is unavailing.[2]

Claimant argues that the ALJ drew the wrong conclusions from the functional reports, and his statements to Dr. Fernandez that he got along well with his children. (ECF No. 10 at 10). Claimant asserts that the ALJ should have considered his ability to get along with strangers as well as his immediate family members in assessing his social functioning. (ECF No. 10 at 9-10). Claimant, however, did not raise this issue in the hearing. In fact, when asked directly if his mental disorders prevented him from working he replied that they did not. (Tr. at 48). Claimant argues that, in his functional reports, he

---

[2] Although 20 C.F.R. § 404.1527(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2), *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

frequently indicated that the chief reason he no longer engages in social activities is that his physical ailments made such activities undesirable to him. (ECF No. 10 at 9-10). However, he does not explain how these statements operate to show an animus toward strangers borne of psychological distress, or how the statements contradict his testimony and the reports of his own physicians.

Furthermore, the record, taken as a whole, does not support Claimant's argument that he has trouble getting along with strangers as opposed to his immediate family. His medical examiners frequently noted that Claimant was a "pleasant" individual. (Tr. at 346, 352, 499). Claimant himself reported that he still occasionally socialized and would meet with friends perhaps once a month. (Tr. at 438, 496). In addition, Dr Adkins on numerous visits observed that Claimant showed no signs of social isolation. (Tr. at 364, 370, 374, 378, 391, 399, 403).

Finally, Claimant notes that the ALJ did not address a discrepancy in the record. (ECF No. 10 at 8). In the initial disability determination record it is first noted that a consultative examination, ("CE") is required, and then that all CEs have been kept, despite the fact that there is no record of a CE occurring. (ECF No. 10 at 8; Tr. at 56-57). It does appear that an error occurred in the initial determination record in indicating that all CEs had been kept. (Tr. at 57). However, at this point in the process, Claimant has been examined by numerous medical specialists and produced a multitude of tests and findings. This record was available for the ALJ's consideration and was examined by the medical expert Judith Brendemuehl, M.D., who testified at the hearing. (Tr. at 29). Claimant has not explained how at this point in the proceedings, he is prejudiced by this error. Furthermore, Claimant's brief raises a challenge to the ALJ's findings regarding his

mental impairments; he does not challenge the ALJ's findings regarding his physical limitations and asks only that his case be reconsidered taking into account the full extent of his mental disabilities. (ECF No. 10 at 13). Any error caused by this omission would relate to the ALJ's analysis of Claimant's physical limitations, as Claimant does not challenge that analysis here, the error, if any, caused by the ALJ's failure to address this discrepancy would be harmless.

Therefore, the undersigned **FINDS** that the ALJ did not err in his evaluation of Claimant's social functioning and further **FINDS** that the mental health limitation contained in the RFC finding was appropriate in scope and supported by substantial evidence.

### B. Concentration Analysis

Claimant argues that the ALJ assigned too much weight to Dr. Fernandez's opinion regarding Claimant's concentration. (ECF No. 10 at 10). The undersigned disagrees with Claimant's contention for the following reasons.

Claimant's argument here runs into a similar issue as his above argument that Dr. Adkins's opinion was given too much weight. Claimant again points to no conflicting medical evidence against which Dr. Fernandez's conclusions were incorrectly weighed. In this area, the ALJ correctly noted that Claimant's examining physician contradicted Claimant's alleged limitations and thus assigned only a mild limitation. (Tr. at 14).

Therefore, the undersigned **FINDS** the weight that the ALJ assigned to Dr. Fernandez's observations regarding Claimant's concentration was supported by substantial evidence.

### C. Pain Symptoms Analysis

Claimant also challenges the ALJ's analysis of his pain symptoms. Claimant contends that the ALJ failed to review the symptoms using the guidelines in SSR 16-3p and, as a result, failed to consider whether Claimant's pain symptoms might have psychological causes. He additionally points to an alleged failure by the ALJ to articulate any conclusions drawn from the longitudinal records of Claimant's treatment history.

Pursuant to 20 C.F.R. § 404.1529, the ALJ evaluates a claimant's report of symptoms using a two-step method. First, the ALJ must determine whether the claimant's medically determinable physical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. § 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ

must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *Id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) A longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for

those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ clearly performed the two-step process. First, he found that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. at 16). However, the ALJ concluded that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms "were not entirely consistent with the medical evidence and other evidence in the record." (*Id.*). The ALJ reached this decision after thoroughly reviewing the medical, opinion, and testimonial evidence that was inconsistent with Claimant's reported pain symptoms. (Tr. at 16-18).

Claimant argues that the ALJ failed to properly consider his case under SSR 16-3p. His argument appears to be two-fold. Claimant first focuses on a statement made by Dr. Fernandez during a November 2015 meeting in which she "addressed the possibility" that Claimant's pain had a psychogenic component.   (ECF No. 10 at 12). Claimant then argues that the ALJ did not explicitly draw any conclusions from the longitudinal record of treatment. (ECF No. 10 at 12-13).

SSR 16-3p rescinded and superseded the prior Ruling, SSR 96-7p. SSR 16-3p, 2017

WL 5180304, at *1. The new ruling eliminated the use of the term "credibility" to track the language of the regulations and clarified that "subjective symptom evaluation is not an examination of an individual's character." *Id.* However, SSR 16-3p did not "substantively alter the analysis or methodology of the two-step process". *Plummer v. Berryhill*, No. 2:17-CV-03591, 2018 WL 3800247, at *16 (S.D.W. Va. July 17, 2018), report and recommendation adopted, No. CV 2_17-3591, 2018 WL 3795271 (S.D.W. Va. Aug. 9, 2018) (citing *Keaton v. Colvin*, No. 3:15CV588, 2017 WL 875477, at *6 n.12 (E.D. Va. Mar. 3, 2017); *Sullivan v. Colvin*, No. 7:15-CV-504, 2017 WL 473925, at *3 n.11 (W.D. Va. Feb. 3, 2017)).

Dr. Fernandez stated on a report made during a November 2015 meeting with Claimant that "Mr. Mosley shows good assimilation of such concepts as radical acceptance, and he appears fairly receptive to information regarding the psychogenic aspects of pain experiences." (Tr. at 502). Claimant argues that there is "no contradictory medical evidence of the same quality" as this statement and that the ALJ failed to analyze this statement in his decision, presumably in violation of SSR 16-3p.

Claimant is correct in noting that there is no medical evidence that contradicts this indication of a possible psychological cause for Claimant's pain symptoms. Indeed, this statement is the only piece of evidence in the entire record that raises the possibility that Claimant's pain might have a psychological component. Nonetheless, the statement in question is not a diagnosis of psychogenic pain, or even a suggestion by Dr. Fernandez that psychogenic pain *might* be the cause of Claimant's pain symptoms. Instead, it is merely documentation that she discussed the concept with Claimant and he "appeared receptive" to receiving information about a psychogenic component to pain experiences.

(*Id.*). As no further elaboration on the subject appears in Dr. Fernandez's treatment notes, and the treatment plan going forward focused on "core mindfulness and distress tolerance skills," the ALJ could give little analysis to the statement. (Tr. at 499).

In any event, "[t]he ALJ need not evaluate in writing every piece of testimony and evidence submitted." *Goad v. Astrue*, No. CIV.A. 1:06-00870, 2008 WL 644881, at *2 (S.D.W. Va. Mar. 7, 2008). "What we require is that the ALJ sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Hartwell v. Colvin*, No. CIV. 1:12-05447, 2014 WL 1225030, at *14, n.2 (S.D.W. Va. Mar. 24, 2014) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). The ALJ was not required to address a single notation by a treating counselor concerning a discussion she initiated Claimant regarding psychogenic pain when no other evidence in the record indicated follow-up of that discussion. While SSR 16-3p provides guidance on the evidentiary value of records inferring the presence of a psychogenic cause of pain, the Ruling does not mandate a discussion of every such notation, regardless of how nebulous or inconsequential.

Claimant also contends that the ALJ failed to properly explain conclusions he drew from examining the course of Claimant's treatment over time. (ECF No. 10 at 12-13; SSR 16-3p, 2016 WL 1119029, at *6). While the ALJ did not expressly refer to SRR 16-3p, he plainly considered the longitudinal treatment record in assessing the supportability and consistency of Claimant's pain symptoms. The ALJ discussed Claimant's treatment history, referring to specific clinical findings and diagnostic studies and remarking that Claimant's treating physicians could not reconcile the level of Claimant's professed pain

symptoms with his MRI findings and lack of response to treatment modalities. (Tr. at 16). The ALJ examined Claimant's statements to treating physicians, his function reports, and his activities over the course of several years and concluded that, while Claimant had pain and physical limitations that reduced his ability to perform certain work activities, his pain and limitations simply were not as disabling as described by Claimant. (Tr. at 17).

For the above reasons, the undersigned **FINDS** that the ALJ did not err in his analysis of Claimant's pain and other symptoms; did not err in failing to discuss the comment by Dr. Fernandez regarding information about psychogenic causes of pain; and did not err by not explicitly referencing SSR 16-3p when assessing Claimant's statements regarding the persistence, severity and disabling effects of his symptoms. To the contrary, the undersigned **FINDS** the ALJ's analysis of Claimant's pain and other symptoms to be compliant with Social Security rules and regulations and supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 13); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code,

Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  September 5, 2018

Cheryl A. Eifert
United States Magistrate Judge

32